UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID DEFABIIS, derivatively on Behalf of KRAFT HEINZ COMPANY, <br><br> Plaintiff, <br><br> vs. <br><br> 3G CAPITAL INC., 3G GLOBAL FOOD HOLDINGS, LP, 3G GLOBAL FOOD HOLDINGS GP, LP, 3G CAPITAL PARTNERS, LP, 3G CAPITAL PARTNERS II LP, 3G CAPITAL PARTNERS, LTD., HK 318 LP, <br><br> Defendants, <br><br> and <br><br> KRAFT HEINZ COMPANY, <br><br> Nominal Defendant. | Civil Action No.: <br><br><br> **SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff David DeFabiis, derivatively, on behalf of Kraft Heinz Company ("Kraft Heinz" or the "Company"), alleges the following based upon information and belief as to the investigation conducted by his counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Kraft Heinz and defendants, securities analyst reports, press releases, and other public statements issued by, or about, the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Kraft Heinz seeking to recover insider trading profits rightfully belonging to Kraft Heinz.  Defendants (hereafter sometimes referred to as "3G" or the "Controlling Shareholder") misused and misappropriated

1

material non-public information about Kraft Heinz business operations and the value of its assets to sell $1.2 billion of Kraft Heinz stock at an average price of $59.47 per share in August 2018 and thereby avoid losses of over $30 per share when Kraft Heinz revealed the extent to which its businesses and assets had been permanently deteriorating.

2.      As of December 2017, the Company showed $44.8 billion in goodwill on its balance sheet, and approximately $53.65 billion of "intangible assets" much of which was added as a result of the Kraft Heinz merger in 2015.  Goodwill and intangible assets together represented 87% of the Company assets in 2018.  However, as early as May 2017, analysts were questioning the stated amount of goodwill and intangible assets the Company was reporting on its financial statements.  Defendants knew that Kraft Heinz's declining results throughout 2017 and 2018 were the result of recognized trends in retail food consumer's preference and buying habits.  Moreover, Controlling Shareholder's relentless cost cutting since it acquired control of Kraft Heinz had caused a material underinvestment in Kraft Heinz brands.  The Company's competitive disadvantage versus better positioned competitors reflected a permanent impairment of brand value that should have been recognized earlier.

3.      The Controlling Shareholder has known since 2017, if not sooner, that the publicly reported value of goodwill and intangible assets was impaired and/or at risk for a near term material impairment charge and was thus overstated throughout 2018 and as a result Kraft Heinz stock price was artificially inflated during 2018.

4.      Company officers, directors, and the Controlling Shareholder have known since at least early 2017 that powerful trends in the retail food and beverage business leading customers towards private label brands such as offered by Amazon, Walmart and Costco were (i) undermining sales growth of Company products; (ii) materially weakening the Company's leverage over retailers for shelf space and promotional support; (iii) continuously weakening the

2

Company's products pricing power in a materially changed competitive landscape for the Company's products in a permanent way, all of which posed an immediate and future threat to the Company's sales, margins and cash flows from units/products. These trends, which continued unabated through 2017 and 2018, presented a material risk to Kraft Heinz that its goodwill and intangible asset valuations were materially overstated and would need to be reduced because of permanent impairment to their value.

5.      The 3G Defendants, whose founders, partners and owners were key executive officers and directors of Kraft Heinz, took advantage of the artificially inflated price of Kraft Heinz in August 2018 and sold material amounts of Kraft Heinz stock based on material non-public information.

6.      On February 21, 2019, after the stock market closed, Kraft Heinz announced that it had to write off almost 20% of its $44 billion dollars in goodwill through an impairment charge and an additional impairment write down of close to 20% of the carrying amounts of certain intangible assets pertaining to its brands. At that time, the total impairment charges resulted in a reported net loss attributable to common shareholders of $12.6 billion and diluted loss per share of $10.34 for the annual period ended December 31, 2018. The loss, and Kraft Heinz's excessive debt load relative to assets and earnings potential, pressured Kraft Heinz into a 36% reduction of its quarterly dividend from the $0.0625 quarterly dividend Kraft Heinz had been paying to $.04 per share. The decrease was designed to save the company $1 billion a year to help reduce long-term debt.

7.      This sudden and massive write down of the Company's goodwill was foreseeable by the Controlling Shareholder and its board designees.

8.      At the same time, the Company publicly disclosed for the first time that Kraft Heinz had received a subpoena from the SEC in October 2018 in relation to accounting

associated with the Company's procurement function.  As a result of the SEC investigation, the Company conducted its own internal investigation, which resulted in the Company recording a $25 million increase to costs of products sold, damaging the Company's credibility and provoking fears of future accounting adjustments.

9.      As a result of the February 19, 2019 disclosures, the price of Kraft Heinz common stock declined over 27% from $48.18 per share on the day before the announcement to $34.95 per share, erasing more than $16 billion of the Company's market capitalization.  Since February 19, 2019 it has traded down to approximately $30 per share.

10.     In March 2019, Kraft Heinz also disclosed the SEC was investigating Kraft Heinz goodwill and intangible asset valuations and impairments.

11.     This shareholder derivative action seeks to recover for the Company the insider trading profits earned by 3G.

12.     Demand is excused in this action because a majority of the members of the Company's Board are not now disinterested (and after announced changes to its Board take place in June and July 2019, will still not be), and cannot act with the requisite independence because they are employed by, associated with, or beholden to, Kraft Heinz and/or 3G Capital (which controls Kraft Heinz through its ownership stake and representation on Kraft Heinz board of directors).  Non 3G-affiliated directors are employed by Kraft Heinz or its other principal owner, Berkshire Hathaway, whose CEO, Warren Buffett, has committed Berkshire Hathaway to several large co-investments with 3G Capital and has publicly stated his desire for Berkshire Hathaway to do more investments with 3G Capital even after 3G's flawed, selfish stewardship of 3G was revealed in February 2019.  As a result the Berkshire Hathaway designated directors on the Kraft Heinz board cannot exercise independent judgment on whether to sue 3G to recover over $600 million of ill-gotten insider profits.

4

## II.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under the laws of the State of Delaware.  This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the Plaintiff, the nominal defendant and the named defendants are all citizens and residences of diverse states, New Jersey and New York, respectively.

14.     Jurisdiction is proper under Federal Rule of Civil Procedure 23.1 because Plaintiff is and was a shareholder of the corporation at the times relevant to the transactions described herein and the action is not one in which collusion is alleged for jurisdictional purposes.  As alleged herein, demand would have been futile.

15.     Venue is proper in this District under 28 U.S.C. § 1391(a) because the Defendants maintain executive offices in this District.

## III.

## PARTIES

### A.     Plaintiff

16.     As set forth in the verification accompanying this complaint, Plaintiff is and was a beneficial owner of Kraft Heinz continuously throughout 2017, 2018 and through the present. Plaintiff will fairly and adequately represent the interests of the shareholders who are similarly situated in enforcing the right of the corporation.  The action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

### B.     Nominal Defendant

17.     Nominal Defendant Kraft Heinz is one of the largest food and beverage companies worldwide.  The Company was formed in 2015 when Kraft Foods Group, Inc. ("Kraft") merged with H.J. Heinz Holding Corporation ("Heinz").  The Company maintains its

principal executive offices in Pittsburgh, Pennsylvania and its common stock is listed and trades

on the NASDAQ under the ticker symbol "KHC." As of 2015 and through the present, it was

controlled by Defendants who owned 595,539,525 million shares of the Company stock 48.8%

(and together with Berkshire Hathaway owned over 70% of all voting shares) and who controlled

the Company's Board.

### C.   Defendants

18.   Defendant 3G Global Food Holding, LP ("3G Global") is a private equity firm

specializing in buyout investments in brands and businesses in the retail and consumer sectors.

During the relevant time period of 2017 - 2019, 3G Global together with its affiliates - - had

access to material adverse non-public information about Kraft Heinz.

19.   Defendants 3G Capital, Inc., 3G Capital Partners II, LP, 3G Capital Partner, Ltd.,

3G Capital Partners LP, 3G Global Food Holdings GP, LP and HK 318 LP are all affiliates of

Defendant 3G Global Food Holdings (collectively, "3G" or "3G Defendants").

20.   The 3G Defendants sold $1.2 billion in Kraft Heinz stock (over 13% of its

investment in Kraft Heinz expressed in dollars), and thereby avoided $600 million in losses

when Kraft Heinz stock price collapsed upon the February 2019 announcement of the permanent

impairment of Kraft Heinz assets and the need to restate prior financial statements.

### IV.

### DEMAND FUTILITY

21.   At the time of the original filing of these claims and, at present, the Company's

Board of Directors consists of eleven members.

22.   Demand would be futile in this action because a majority of the members of the

Board cannot exercise independent and disinterested business judgment in responding to a

demand to sue for the reasons set forth herein.

23.     A majority (at least seven of eleven) of the Company's board is employed by

Kraft Heinz (Zoghbi, Cahill) or 3G Capital (Behring, Lemann, Telles/Castro Nieves) or

Berkshire Hathaway (Abel, Cool) and thus incapable of rendering independent judgment with

respect to a suit against 3G.  Director Van Damme has close business relationships with 3G.

### A.     The Directors

24.     Alexandre Behring ("Behring") was appointed Chairman of The Kraft Heinz

Company board of directors effective July 2015 and previously served as Chairman of the Heinz

board from June 2013 to July 2015.  Mr. Behring is a co-founder of 3G Capital, a global

investment firm, and has been its managing partner and a director since 2004.  Since 2014 he has

served as the Executive Chairman of the Board of Restaurant Brands International, Inc. a major

food service conglomerate owned by Defendants.  He is also director of Anheuser-Busch Inbev

SA/NV, a global brewer wherein Defendants own, directly or indirectly approximately 40% of

the shares since April 2014.  3G maintains significant investments in, and controls, both

Restaurant Brands International and InBev.  Behring is chair of both Kraft Heinz's

Compensation Committee and Nominating and Corporate Governance Committees.

25.     Jorge Paulo Lemann ("Lemann") was appointed to The Kraft Heinz Company

board of directors effective July 2015 and previously served on the Heinz board from June 2013

to July 2015.  Mr. Lemann is a co-founder of 3G Capital, a global investment firm and has

served as a director since 2004.  Mr. Lemann was formerly a director of Anheuser-Busch InBev.

He is a member of both the Compensation Committee and Nominating and Corporate

Governance Committee.

26.     (a) Marcel Herrmann Telles ("Telles") was appointed to The Kraft Heinz

Company board of directors effective July 2015 and previously served on the Heinz board from

June 2013 to July 2015.  Mr. Telles is a co-founder of 3G Capital, a global investment firm and

has served as a director since 2004. He also serves as a director of Anheuser-Busch InBev since 2004 and as a director of AmBev, a subsidiary of Anheuser-Busch InBev since 2000. He is a member of both the Compensation and Nominating and Governance Committees. (b) Telles is scheduled to retire June 12, 2019 and it was announced that he will be replaced on the board by Joao M. Castro-Nieves who is a 3G partner and was a partner at the time 3G executed its insider trading in August 2018.

27.    Alexandre Van Damme ("Van Damme") has served as a member of the board of Restaurant Brands International since December 2014 which is controlled by 3G. Van Damme has been publicly described as "close" to 3G's founders. He previously served on the board of Burger King Worldwide, Inc. (now part of Restaurant Brands) and its predecessor from December 2011 to December 2014. Van Damme has served as a member of the board of directors of Anheuser-Busch InBev since 1992 which 3G also controls as described above.

28.    George Zoghbi ("Zoghbi") is a director and a full-time paid "Special Advisor" to the Company working with the Kraft Heinz Board of Directors and the 3G partners who are Kraft Heinz Executive Officers. In its 2018 Notice of Annual Meeting of Shareholders, Kraft Heinz has admitted that Zoghbi is not "independent."

29.    John T. Cahill ("Cahill") was appointed Vice Chairman of the Kraft Heinz Company board of directors effective July 2015. Cahill is currently a paid "consultant" to Kraft Heinz. In its 2018 Notice of Annual Meeting of Shareholders, Kraft Heinz admitted that Cahill is not "independent."

30.    Gregory Abel ("Abel") was appointed to the Kraft Heinz Company board of directors effective July 2015 and previously served on the Heinz board from June 2013 to July 2015. He is the CEO of Berkshire Hathaway Energy. In January 2018, Mr. Abel was elected to the Board of Directors of Berkshire Hathaway, a diversified holding company, and appointed as

its Vice Chairman, Non-Insurance Business Operations.  Abel is Berkshire Hathaway's and Warren Buffet's employee.

31.     Tracy Britt Cool ("Cool") was appointed to the Kraft Heinz Company board of directors effective July 2015 and previously served on the Heinz board from June 2013 to July 2015.  Ms. Cool started her career at Berkshire Hathaway as Mr. Buffet's financial assistant. Five years later at age 30, she was named the Chief Executive Officer of The Pampered Chef (a Berkshire Hathaway company), a direct seller of high-quality cooking tools.  Ms. Cool is currently is a director of three Berkshire Hathaway Companies: Benjamin Moore & Co., a leading manufacturer and retailer of paints and architectural coatings (since June 2012), Larson-Juhl, a manufacturer and distributor of wood and metal framing products (since January 2012), and Oriental Trading Company, a direct merchant of party suppliers, arts and crafts, toys and novelties (since November 2012).

32.     Feroz Dewan ("Dewan") was appointed to The Kraft Heinz Company board of directors effective October 2016 and is a member of the Audit Committee.  He is the CEO of Arena Holdings Management LLC, an investment holding company.

33.     Jeanne P. Jackson ("Jackson") was appointed to The Kraft Heinz Company board of directors effective July 2015 and previously served on the Kraft board from October 2012 to July 2015.  She is currently a member of both the Compensation and Nominating and Corporate Governance Committee.  Ms. Jackson is Founder and Chief Executive Officer of MSP Capital, a private equity and investment company.  She currently serves as a director of Delta Airlines, Inc. and McDonald's Corporation and was formerly a director of Motorola Mobility Holdings, Inc.

34.     John C. Pope ("Pope") was appointed to The Kraft Heinz Company board of directors effective July 2015 and previously served on the Kraft board from August 2012 to July 2015.  He is the Chair of the Audit Committee and a member of the Nominating and Corporate

Governance Committee. Mr. Pope has served as Chairman of PFI Group, LLC, a financial

management firm, since 1994. Mr. Pope also serves as Chairman of the Board of R.R.

Donnelley and Sons Co., a printing company, since May 2014; and as a director of Talgo S.A., a

railcar manufacturer, since March 2015; and as a director of Waste Management, Inc., a provider

of comprehensive waste management services, since 1997.

35.     A majority of Kraft Heinz board was not and are not now independent or

disinterested, due to (i) domination and control by 3G and their own personal financial interests

as partners of 3G; (ii) being non-independent directors of Kraft Heinz; or (iii) being executive

officers of Berkshire Hathaway.

36.     3G dominated and controlled Kraft Heinz and its board members. In May 2013,

the New York Times, in an article on Kraft Heinz discussing the operation of the company noted

"3G is closely held and their partner – including Kraft Heinz's chief executive officer, Bernardo

Hees – takes a hands on approach to managing their investments." Bernando Hees of Kraft

Heinz: "New Mistakes Are Welcome," The New York Times, May 3, 2018, David Gilles. It was

reported in 2015 that Lemann, then 75, had "handed over daily operations of 3G to a handful of

associates, including Behring."

37.     The connections among Kraft Heinz, 3G, and Berkshire Hathaway are significant

and, because the majority of Kraft Heinz directors are partners of 3G or executive officers of

Berkshire Hathaway, demonstrate why demand is excused in this case.

(a)     In 2013, 3G and Berkshire Hathaway teamed up to take Heinz private in a

$23 billion deal. In SEC filings, Kraft Heinz has admitted that Berkshire Hathaway and 3G have

"substantial control" of Kraft Heinz and "may have conflict of interests" between them and Kraft

Heinz.

(b)     When the Kraft Heinz deal closed Mr. Buffett was reported to have said in an interview: "We [Berkshire Hathaway] may increase our ownership if any members of the 3G Group ultimately want to sell out later."

(c)     In 2014 Berkshire Hathaway loaned 3G $3 billion to finance Burger King's acquisition of Canadian restaurant chain Tim Horton's.

(d)     In 2015, The New York Times quoted Warren Buffett about his 3G partners: "I knew they were wonderful going into the Heinz deal." "In terms of ability, in terms of integrity, every aspect of it. 3G has been a perfect partner." (See, "3G Capital, Warren Buffett's Favorite Partner in Deals worth Billions.") The author of the article noted that Berkshire Hathaway's Warren Buffett and 3G's founder, Jorge Paulo Lemann, have known each other for "decades" and "the two men have grown close."

(e)     Berkshire Hathaway Chairman Warren Buffett has repeatedly expressed a desire and willingness to partner with 3G on more investments. That public posture, asserted repeatedly, compels the conclusion that Berkshire Hathaway affiliated Kraft Heinz directors will not take any action against 3G or its designated directors. On February 27, 2015, in his annual letter to shareholders Warren Buffett wrote about 3G:

> Two years ago my friend, Jorge Paulo Lemann, asked Berkshire to join his 3G Capital group in the acquisition of Heinz. My affirmative response was a no brainer. I knew immediately that this partnership would work well from both a personal and financial standpoint. And it most definitely has.
>
> . . . .
>
> We expect to partner with 3G in more activities . . . . Our favored arrangement, however, will usually be to link up as a permanent equity partner (who is some cases, contributes to the financing of the deal as well). Whatever the structure, we feel good when working with Jorge Paulo.

11

(f)     In his 2016 letter to shareholders Mr. Buffett wrote about 3G and the Kraft Heinz mergers:

> Jorge Paulo and his associates could not be better partners.

> . . . <u>We will also look for opportunities to partner with Jorge Paulo</u>, either as a financing partner, as was the case when his group purchased Tim Horton's, or as a combined equity-and-financing partner, as at Heinz.

(g)     On March 7, 2017, The New York times quoted Warren Buffett praising 3G: "Jorge Paulo and his associates could not be better partners." The New York Times, Deal Professor, "Can 3G Capital Keep Thriving On Acquisitions and Cost Cutting?" Steven David Solomon. Even after Kraft Heinz stock price fell to approximately $30 per share after the February 2019 disclosures of material brand value erosion and internal control issues and SEC subpoenas, <u>Buffett defended 3G founder Lemann publicly calling him an "outstanding human being" and said he would "absolutely continue doing business with him."</u>

(h)     Further, notwithstanding that Berkshire Hathaway itself did not sell any stock along with 3G, Berkshire Hathaway nonetheless is exposed to a substantial likelihood of liability. As a result of the relationships between and among Berkshire Hathaway and 3G, they may be deemed to be a "group" for the purpose of Section 13(d) of the Exchange Act. Berkshire Hathaway and 3G were deemed a group because of their agreement to acquire, hold and/or dispose of Kraft Heinz stock. *See* Section 13(d)(3) Exchange Act. Accordingly, The Berkshire Hathaway affiliated directors on the board, namely, Abel and Cool, are incapable of rendering independent judgment with respect to a suit against 3G and Kraft Heinz officers and directors.

38.     Demand is further excused because the Directors face a substantial likelihood of liability in potential actions arising out of non-disclosure of the impairment of assets. All Kraft Heinz directors potentially face substantial liability under Section 11 of the Securities Act of 1933 for signing materially misleading and false Registration Statements with respect to the

2018 billion dollar bond offering.  Under that statute, the Kraft Heinz has limited defenses to potential liability.  Accordingly, these directors would not authorize a suit that could uncover facts exposing all directors to Section 11 liability potentially for hundreds of millions of dollars.

### B.     Duties Owed By 3G To Kraft Heinz

39.     Under long established Delaware law, controlling shareholders are company fiduciaries who stand in a trustee-like position vis a vis the Company.

40.     3G is an entity which operates through its partners and employees.  3G's "knowledge" is the sum total of its partners knowledge.  The Controlling Shareholder could not access the adverse material non-public information without the officers and directors who are affiliated with 3G violating the Code of Conduct duties by reporting back to 3G material adverse non-public Kraft Heinz information about the pace and magnitude of Kraft Heinz's brand value erosion and the near term risk of impairment of values thereof.  The 3G partners who were/are Kraft Heinz executive officers are:

(a)     Bernardo Hees ("Hees") is a 3G partner, and was at all relevant times, Kraft Heinz's Chief Executive Officer.

(b)     Paulo Basilio ("Basilio") a 3G partner, served as Kraft Heinz's Executive Vice President ("EVP") and Chief Financial Officer ("CFO") from its formation in July 2015 until October 1, 2017, when he was appointed as the Company's Zone President of U.S business.

(c)     David Knopf ("Knopf") a 3G partner joined Kraft Heinz upon its formation in July 2015, initially serving as Vice President of Finance, Head of Global Budget & Business Planning, Zero-Based Budgeting, and Financial & Strategic Planning.  On October 1, 2017, Knopf assumed Defendant Basilio's CFO responsibilities when Basilio was appointed as the Company's EVP and CFO.

41.     The Kraft Heinz Company Employee Code of Conduct contains prohibitions,

restrictions and guidelines on insider trading that are applicable to directors:

> Never buy or sell Company securities . . . when you possess inside
> information or during trading blackout periods.
>
> . . . .
>
> Don't disclose inside information to anyone outside the Company
> (including family members of friends) for any reason.  If that
> person uses this information to trade in the stock market, you are
> legally responsible for tipping that person.

42.     The Employee Code of Conduct specifically addressed "directors" and "waivers"

of compliance with the Code:

> WAIVERS
>
> While all of us are expected to uphold our Code at all times, the
> Company understands that, in rare circumstances, a waiver of the
> Code might be necessary.  Such waivers are granted on a case by
> case basis and are only appropriate when strict adherence to the
> Code could cause significant hardship.
>
> Any waiver or amendment of this Code for the Chief Executive
> Officer, General Counsel, Chief Financial Officer, Global
> Controller, other senior financial or executive officers or directors
> must be approved by the Board of Directors.

43.     All of Controlling Shareholder's designated directors were expected to adhere to

the following Code of Conduct which they were required to sign and affirm, which included, in

part the following provisions:

**Conflicts of Interest**

Maintaining its loyalty to the Company, avoiding any situations
that create or appear to create a conflict of interest and providing
notice to the Chair of any actual or apparent conflict of interest.

. . . .

**Corporate Opportunity**

Refraining from using the Company's property, information or
position for personal gain.

. . . .

**Proprietary Information**

Maintaining the confidentiality of the Company's proprietary
information, except when the Company authorizes disclosures or
as required by laws, regulations, or legal proceedings.

## V.

## SUBSTANTIVE ALLEGATIONS

44.     In February 2013, the public company, H. J. Heinz Company, was acquired by

non-public Heinz for $23 billion.  At that time, Heinz was controlled by Berkshire Hathaway Inc.

("Berkshire Hathaway") and 3G Capital, who together beneficially owned approximately 50% of

Heinz.

45.     3G Capital is a Brazilian-American, private equity firm known for achieving

significant cost reduction in companies under its management by, among other things,

implementing zero-based budgeting at its portfolio companies.  Zero-based budgeting is a

process whereby budgets are determined only after all anticipated expenses in a given period

have been justified as being necessary, irrespective of what the budget may have been in a prior

period.

46.     On March 25, 2015, Kraft announced a $35 billion merger with Heinz, arranged

by Berkshire Hathaway and 3G Capital.  The companies heralded the "significant synergy

15

opportunities" that would result from "combining Kraft's brands with Heinz's international platform" while promising to be "fully committed to maintaining an investment grade rating." The resulting company was expected to have a market value of over $80 billion.

47.     Kraft Heinz is one of the largest food and beverage companies in the world with a portfolio of mature brands that include *Heinz, Kraft, ABC, Oscar Mayer, Philadelphia, Classico, Planters, Velveeta, Jell-O, Lunchables, Kool Aid, Maxwell House, Capri Sun, Smart-Ones and Ore-Ida.* The Kraft businesses manufacture and market food and beverage products, including cheese, meats, refreshment beverages, coffee, packaged dinners, refrigerated meals, snack nuts, dressings, and other grocery products, primarily in the U.S. and Canada. The Heinz businesses manufacture and market an extensive line of food products, including ketchup, condiments and sauces, frozen food, soups, beans and pasta meals, infant nutrition and other food products.

48.     After the Merger, Kraft Heinz was led by 3G executives and partners. Hees, a partner at 3G Capital since July 2010, became CEO of Kraft Heinz upon the closing of the Merger after serving as CEO of Heinz since its formation in June 2013. Likewise, Basilio, a partner of 3G Capital since July 2012, became EVP and CFO of Kraft Heinz upon the closing of the Merger after previously serving as CFO of Heinz since its formation in June 2013 and then became U.S. zone President in 2017. On October 1, 2017, Knopf, then only 29 years of age, assumed Defendant Basilio's responsibilities and became EVP and CFO of Kraft Heinz. Knopf has been a partner of 3G Capital since July 2012 and held various roles at 3G Capital from 2013 to 2015.

49.     Consistent with 3G's philosophy, Kraft Heinz adopted a series of cost reduction initiatives after the merger when integrating the operations of Kraft and Heinz. These cost-cutting initiatives initially helped lower costs and drive increases in highly leveraged Kraft Heinz's profitability even though the Company's sales were declining.

50.     From the start in 2015, the Kraft Heinz strategy centered on harsh cost-cutting to create earnings growth.  Defendants knew, or should have known, that, as a result of their cost cutting obsession, company products were being starved of marketing and promotion and research and development funds.  In addition, powerful consumer trends were weakening the Company's pricing power and competitive position relative to competitors Costco, Walmart and Amazon products.

51.     Despite the Company's positive public statements, behind the scenes, this high-profile merger with expectations to create long term shareholder value failed to deliver.  Kraft Heinz's operational results have been faltering since late 2016.  Sales grew only .3% in 2016 and through the third quarter of 2017 were down 1.8%.  Beginning in the first quarter of 2017, Kraft Heinz net (organic) sales began a steady decline, in that quarter they declined 2.7%.  In the 2nd quarter 2017, organic net sales declined 0.9%.  In the 3rd quarter 2017 net organic sales increased .3%.  In the 4th quarter of 2017, organic net sales declined .6%.  "Organic" sales are defined by Kraft Heinz as "net sales excluding, when they occur, the impact of acquisitions, currency, divestitures and a 53rd week of shipments".  Over the preceding two years, Kraft Heinz's cash on hand fell from $3.9 billion to $1.4 billion even as debt increased, including a $1 billion increase in debt through the first three quarters of 2018.  These trends were the result of declining cash flow caused by the trends identified here.

52.     In February 2018, Warren Buffet retired from Kraft Heinz Board of Directors, reportedly to "decrease his travel commitments".

53.     In the first quarter of 2018, organic net sales decreased 1.5%; in the 2nd quarter of 2018 organic net sales declined by .4%.

54.     Several days after the report of the results 2nd quarter 2018, Defendants sold 20 million shares of Kraft Heinz stock at approximately $59.50 per share.

55.     Kraft Heinz's sales declines and brand impairment were the predictable result of 3G's extreme cost cutting and reduction in advertising and marketing budgets.  Kraft Heinz has been spending only 2-3% of annual sales revenues on advertising and marketing its brands compared to the industry average of 5% to 10%.  According to published analysis, Kraft Heinz cut advertising 11% to $629 million in 2017 to 2.4% of sales compared to the 3.5% to 5.5% of sales at competitors Kellog, Mondalez and Conagra.  At Kraft Heinz, research and development dropped 22% in 2017 to $120 million or 0.3% of sales versus industry peers' expenditures of approximately 1% of sales. Kraft, before its merger with Heinz, spent $149 million on research and development.

56.     By mid-2017, Defendants knew that 3G's belt-tightening measures had run their course, depleted the Company of valuable resources, marginalized its internal controls, and left Kraft Heinz's iconic brands badly damaged.  The shift from Kraft Heinz legacy brands to organic or private label offerings impaired the Company's pricing power and commoditized its product categories.

57.     The impairment charges pertain to reported valuation estimates of good will and intangible assets.  Kraft Heinz has represented that it makes value estimates for goodwill and intangible assets based on *inter alia* "estimated future annual net cash flows for each reporting unit (including net sales, costs of products sold, SG&A, working capital and capital expenditures)."  The inputs of those estimates are not publicly known, nor calculable by non-insiders, accordingly only an insider would/could have such knowledge.

58.     Kraft Heinz supposedly had an established formula for calculating both "fair value" of goodwill and intangible assets and any impairment thereof.  As stated in its 1Q 2018 10-Q, (and repeated in pertinent part in prior and subsequent periodic financial reports) the

Company was carrying $44.8 billion in goodwill and $53.8 billion in intangible assets, stating, in

pertinent part, the following:

> We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2017 annual impairment test as of April 2, 2017. As a result of our 2017 annual impairment test, there was no impairment of goodwill. Each of our goodwill reporting units had excess fair value over its carrying value of at least 10% as of April 2, 2017.
>
> Our goodwill balance consists of 20 reporting units and had an aggregate carrying value of $44.8 billion as of March 31, 2018. As a majority of our goodwill was recently recorded in connection with business combinations that occurred in 2015 and 2013, representing fair values as of the respective transaction dates, there was not a significant excess of fair values over carrying values as of April 2, 2017. We have a risk of future impairment to the extent that individual reporting unit performance does not meet our projections. Additionally, if our current assumptions and estimates, including projected revenues and income growth rates, terminal growth rates, competitive and consumer trends, market-based discount rates, and other market factors, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair value of our goodwill could be adversely affected, leading to a potential impairment in the future. No events occurred during the period ended March 31, 2018 that indicated it was more likely than not that our goodwill was impaired. There were no accumulated impairment losses to goodwill as of March 31, 2018.
>
> * * *
>
> We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2017 annual impairment test as of April 2, 2017. As a result of our 2017 annual impairment test, we recognized a non-cash impairment loss of $49 million in SG&A in the second quarter of 2017. This loss was due to continued declines in nutritional beverages in India. The loss was recorded in our EMEA segment as the related trademark is owned by our Italian subsidiary. Each of our other brands had excess fair value over its carrying value of at least 10% as of April 2, 2017.

> Our indefinite-lived intangible assets primarily consist of a
> large number of individual brands and had an aggregate
> carrying value of $53.8 billion as of March 31, 2018.  As a
> majority of our indefinite-lived intangible assets were
> recently recorded in connection with business combinations
> that occurred in 2015 and 2013, representing fair values as
> of the respective transaction dates, there was not a
> significant excess of fair values over carrying values as of
> April 2, 2017.  We have a risk of future impairment to the
> extent individual brand performance does not meet our
> projections.  Additionally, if our current assumptions and
> estimates, including projected revenues and income growth
> rates, terminal growth rates, competitive and consumer
> trends, market-based discount rates, and other market
> factors, are not met, or if valuation factors outside of our
> control change unfavorably, the estimated fair values of our
> indefinite-lived intangible assets could be adversely
> affected, leading to potential impairments in the future.  No
> events occurred during the period ended March 31, 2018
> that indicated it was more likely than not that our
> indefinite-lived intangible assets were impaired.

59.     Only insiders, and not public investors, could discern the increasing impairment in the value of these assets because Kraft Heinz's financial reports were notoriously lacking in details as noted by Wells Fargo analyst John Baumgartner's reported reaction to poor third quarter financial results in November 2018 that Kraft isn't known for "copious financial detail." The investing public could not discern or even estimate the ongoing impairment in value because Kraft Heinz, as reported, made the calculations based on "estimated future annual net cash flows for each reporting unit (including net sales, costs of products sold, SG&A, working capital and capital expenditures)" none of which were provided to public investors with the necessary details.

60.     By April 2018, director Lemann (a 3G partner) was publicly admitting that Kraft Heinz's business was "being disrupted" (as reported in Forbes Editor's Pick, April 30, 2018, Jorge Paulo Lemann Says Era of Disruption In Consumer Brands Caught 3G Capital By Surprise," Antoine Gara.).

61.     Further admissions by Lemann were reported in April 2018 in The Wall Street Journal, where the 3G co-founder, Kraft director and controlling person was quoted:

> I'm a terrified dinosaur. I've been living in this cozy world of old brands [and] big volumes. You could just focus on being very efficient and you'd be ok all of a sudden we are being disrupted in all ways. If you go to a supermarket, you see hundreds of new brands. In beer, we had the new kinds of beer coming in from all over. We are running to adjust.

62.     In 2019 in a CNBC interview as reported in a February 25, 2019 Dow Jones News Report, Warren Buffett revealed what afflicted KHC in 2018:

> KHC was losing its bargaining power with retailers due to competition with private label brands such as Costco's "Kirkland." [Mr. Buffett noted how fast and how far KHC had fallen behind Costco]: "So here they are, 100 years plus tons of advertising, built into people's habits and everything else and now Kirkland, a private label brand comes along with only 750 outlets does 50% more business." Mr. Buffett also noted that consumer brands' "ability to price has changed."

63.     Further admissions appeared in a Reuters February 25, 2019 interview Mr. Buffett also acknowledged that Amazon.com Inc., Walmart, Inc. brands were pressuring KHC. He also said "the ability to price has changed, and that's huge."

64.     Further evidence that Defendants as insiders had access to material adverse information may be inferred from the fact that SEC reporting requirements mandated that Kraft Heinz perform the analysis of trends and uncertainties that would lead to the asset writedown.

65.     3G's partners who were Kraft Heinz officers and/or directors were also privy to the material adverse information of decline in asset value because SEC reporting requirements forced Kraft Heinz to analyze the relevant issues. Throughout 2017 and 2018, KHC filed an Annual Report on Form 10-K and three Quarterly Reports on Form 10-Q for each of the quarterly periods in 2017 and 2018. Each of the filings and their respective contents were governed by SEC rules and regulations, including but not limited to "Regulation S-K: Item 303

Requirements" (management's discussion and analysis of financial condition and results of operations).

        (a)      **Item 303 Requirements Regulations S-K** Item 303 imposes an affirmative duty on issuers to disclose "events" or "uncertainties" that will have a material or unfavorable impact on the registrant's future revenue.[1]

        (b)      Specifically, Item 303 requires issuers to disclose in the registration statement any "trend, demand, commitment, event or uncertainty" that is "both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operations."[2] Pursuant to Item 303(a), for a fiscal year, a registrant has an affirmative duty to: (i) describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected; (ii) describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.[3]

---

[1] *See* 17 C.F.R. § 229.303(a)(3)(i) & (ii); Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation, Exchange Act Release No. 6835 ("S.E.C. Release No. 6835"), 1989 WL 1092885, at *4 (May 18, 1989).

[2] *See id.;* 17 C.F.R. § 229.303(a)(3)(ii).

[3] *See* 17 C.F.R. § 229.303(a)(3)(i)-(ii); *see also* S.E.C. Release No. 6835,1989 WL 1092885, at *8 (May 18, 1989) ("Other non-recurring items should be discussed as unusual or infrequent events or transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation omitted).

(c)     Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact of results, must be disclosed.   Examples of such required disclosures include: "[a] reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.[4] Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information."[5]  Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition ... with particular emphasis on the registrant's prospects for the future."[6]  Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."[7]

66.     The impairment in Kraft Heinz assets was only unveiled to the public when, on February 21, 2019, Kraft Heinz announced its earnings for the fourth quarter of 2018 and disclosed that the Company took an impairment charge of $15.4 billion to lower the carrying amount of goodwill in its U.S. Refrigerated and Canada Retail reporting units and the carrying amount of certain intangible assets, including the Kraft and Oscar Mayer trademarks. The impairment charge resulted in a net loss attributable to common shareholders of $12.6 billion and diluted loss per share of $10.34.  The impairment charges were approximately 13%

---

[4]     S.E.C. Release No. 6835, 1989 WL 1092885, at *4.

[5]     *Id.* at *3.

[6]     *Id.*; *see* also *id.* at *17.

[7]     *See* Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

and 15% of the amount of goodwill and intangible assets respectively which Kraft Heinz represented to public investors.

67.     The Company further publicly disclosed, for the first time on February 21, 2019, that Kraft Heinz had received a subpoena from the SEC in October 2018 in relation to the Company's procurement function. As a result of the SEC investigation, the Company conducted its own internal investigation, which resulted in the Company recording a $25 million increase to costs of products sold, damaging the Company's credibility and provoking fears of future accounting adjustments.  On the same day, the Company announced a quarterly dividend of $0.40 per share, which represents a 36% reduction from the $0.625 quarterly dividend Kraft Heinz had been paying. This reduction was designed to save the company $1 billion a year to help reduce long-term debt of $30.9 billion.

68.     As a result of these disclosures, the price of Kraft Heinz common stock plummeted over 27% from $48.18 per share to $34.95 per share, erasing more than $16 billion of the Company's market capitalization on extremely heavy trading volume.  3G however avoided these losses by selling 20,000,000 shares at approximately $59.50 per share.

69.     In 2019, Kraft Heinz disclosed information further indicating that insiders were aware of the material risk of material asset impairment and that such impairment charges were anticipated.  Kraft Heinz stated it tests its asset valuations for goodwill and intangible assets on the first day of the second calendar quarter of each year.  Kraft Heinz also represented that it may perform such tests at other times as well depending on circumstances such as:

-        a sustained decrease in market cap of Kraft Heinz;

-        Increased competition or unexpected loss of market share;

-        Unexpected significant declines in operating results; and

-        Significant adverse changes in markets.

70.     All of these triggering events occurred in 2017 through 2018 and thus insiders had non-public knowledge of the risk of material asset writedowns.

71.     In an interview reported by Reuters on February 25, 2019 "Warren Buffett Says Berkshire Overpaid For Kraft Heinz," Mr. Buffett observed the market reacted "probably quite properly" to the news.  In an interview reported on Dow Jones News on February 25, 2019 Mr. Buffett said he wouldn't buy more Kraft Heinz for Berkshire Hathaway "because it isn't worth as much."

72.     On March 1, 2019, the SEC subpoenaed Kraft Heinz for documents related to assessment of goodwill and intangible asset impairments.

73.     On June 7, 2019, Kraft Heinz finally issued its overdue Annual Report on Form 10-K for the annual period ended December 31, 2017.   In it, Kraft Heinz revealed an "impairment loss" of $7 billion reducing its goodwill asset value from $44.8 billion to $36.50 billion at the end of 2018.  Similarly, Kraft Heinz reported an impairment loss of $8.925 billion to intangible assets reducing the value of that asset from $53.65 billion at the end of 2017 to $43.97 billion at the end of 2018.

## CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY FOR INSIDER SELLING AND MISAPPROPRIATION OF MATERIAL, NON-PUBLIC INFORMATION AGAINST 3G DEFENDANTS

74.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as through fully set forth herein.

75.     During the Relevant Period, Defendants 3G Capital (the "Selling Defendants") sold Kraft Heinz stocks, while they knew the material adverse non-public information described herein, and sold Kraft Heinz stock on the basis of such information.

76.     3G's sale of $1.2 billion of Kraft Heinz stock is significant because it represents approximately 13% of 3G's original investment in Kraft Heinz.  In 2013, 3G invested $4 billion of its cash in the Heinz takeover and then an additional $5 billion.  The sale at issue here was 3G's first sale of Kraft Heinz securities since the merger.  Traditionally, 3G has not sold any portion of its major holdings in many years; 3G's last sale of Restaurant Brands International stock occurred in 2015.

77.     The material information described above was proprietary, non-public information concerning the Company's business and financial condition.  It was a proprietary asset belonging to the Company, which 3G used for their own benefit when they sold Kraft Heinz stock.

78.     Because using the Company's proprietary information for their own gain constitutes a breach of 3G's fiduciary duties, and/or an unlawful misappropriation of inside information, the Company is entitled to the imposition of a constructive trust on any profits they obtained thereby and subsequent return thereof.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment as follows:

(a)     Determining that this action is a proper derivative action maintainable under law and demand is excused;

(b)     Awarding to Kraft Heinz restitution from 3G, and ordering disgorgement of all profits, obtained by 3G from its insider trading;

(c)     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(d)     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: June 14, 2019

SQUITIERI & FEARON, LLP

By:_____
                  Lee Squitieri
32 East 57th Street
12th Floor
New York, New York 10022
(212) 421-6492
lee@sfclasslaw.com

Counsel for Plaintiff

**VERIFICATION**

I, David DeFabiis, declare under the laws of the United States and under penalty of perjury:

I am the plaintiff in the within action.  I have read the foregoing Complaint and know the contents thereof; the same is true to my own knowledge with respect to the matters pertaining to my ownership of Kraft-Heinz, Inc. stock.  As to all other matters, I believe them to be true based upon the investigation conducted by my counsel.  I am and have been at all relevant times, a shareholder of the nominal defendant Kraft-Heinz, Inc.

David De Fabiis

June 12, 2019